## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANA O'DELL,** | : | **Civil No. 3:24-cv-941** |
| | : | |
| **Plaintiff,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK BISIGNANO**, | : | |
| **Commissioner of Social Security**[1] | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

We most assuredly do not write upon a blank slate in this case. Quite the contrary, we are the fourth judge to consider O'Dell's case, and we are now called upon to examine the fourth Administrative Law Judge (ALJ) decision addressing O'Dell's disability claim.

This prolonged litigation has now spanned nearly fourteen years. During these years there has been one unchanging truth, a truth noted by this Court on the first occasion when it remanded this case for further consideration by the

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

Commissioner—O'Dell's treating physicians have consistently concluded that she is disabled by her cascading array of impairments. In reaching these congruent findings, O'Dell's treating physicians have cited an array of physical and emotional impairments but have invariably observed that O'Dell—who weighs more than 300 pounds—is morbidly obese, a condition that severely exacerbates her other conditions.

This fixed and firm treating source consensus has particular resonance in the instant case since, at the time of her disability application, analysis of medical opinions was governed by what was referred to as "the treating physician rule." This treating source rule was aptly described as: "A cardinal principle guiding disability eligibility determinations . . . that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

Much of the past decade of litigation has involved judicial review of efforts by ALJs to discount this treating source consensus in a fashion which complied with this then existing cardinal principle, the treating physician rule. These past efforts have been unavailing, compelling multiple remands. As we consider this fourth attempt to reconcile a partial denial of O'Dell's benefits with the treating physician rule we find, once again, that this latest effort also falls short of what the law requires.

In particular, we find that the ALJ's reliance upon the opinion of a non-treating, non-examining source, Dr. Donald Carr, to discount this longstanding treating source consensus is misplaced. Dr. Carr first opined on O'Dell's limitations in March of 2024, nearly ten years after the critical care and treatment at issue in this case. Dr. Carr never examined or treated O'Dell. Moreover, given the central role that O'Dell's morbid obesity played in the disability analysis of all of her treating physicians, remarkably Dr. Carr testified that: "I didn't take into consideration her obesity when—when going through the file as well as the workday limitations." (Tr. 2126). The ALJ's reliance upon this testimony to overcome both the treating source consensus that O'Dell is disabled and the treating physician rule is even more remarkable in light of Dr. Carr's concession that: "Somebody that has seen this patient and taking care of this patient is going to have—and examine this patient is going to have a better perception of their overall ability to function than I am." (Tr. 2138).

Simply put, more is needed here under the treating physician rule before these treating physician opinions are all discounted. Accordingly, we will remand this case for further consideration by the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Introduction</u>

This legal odyssey began nearly fourteen years ago, on November 8, 2012, when Dianna O'Dell protectively filed under Titles II and XVI of the Social Security Act for a period of disability and disability insurance benefits as well as supplemental security insurance, alleging an onset of disability beginning July 4, 2012. (Tr. 14). Over the years O'Dell has cited a constellation of severe physical and emotional impairments in support of this disability application. Thus, at various times ALJs have concluded that O'Dell suffers from an array of impairments including ankle sprain, chest wall strain, back impairment, neck impairment, degenerative disc disease of the cervical, thoracic and lumbar spine, post-traumatic stress disorder (PTSD), anxiety, and depression. (Tr. 17, 340, 1114, 2092).

Moreover, at each stage of these proceedings, O'Dell's morbid obesity was identified as a severe impairment. (<u>Id.</u>) The evidence of this severe medical condition is entirely beyond dispute. Indeed, the clinical record is replete with evidence that O'Dell's weight frequently exceeded 300 pounds and her body mass index or BMI ranged from 52 to 63, medically significant proof of a substantial impairment which compounded and complicated all of O'Dell's other physical and emotional conditions. (Tr. 2158).

4

O'Dell was born on August 7, 1968. (Tr. 1633). Thus, she was 43 years old when this litigation began, which initially defined her as a younger worker under the Social Security regulations. However, over the fourteen years that this application has been pending she transitioned into an individual closely approaching advanced age. (Tr. 2104). O'Dell is now 57 years old and has attained advanced age status under the Commissioner's regulations as she awaits the resolution of this case. O'Dell had past relevant work experience as a waitress and cashier, work which all agree she can longer perform. (Tr. 2104).

## B. Procedural History

O'Dell's journey through the Social Security system has been painfully prolonged. Following her initial disability application in November of 2012, O'Dell's claim was heard by an ALJ on March 24, 2014. (Tr. 27-63). On August 4, 2014, the ALJ issued a decision denying O'Dell's claim. (Tr. 11-26). In this decision, the ALJ acknowledged that O'Dell's treating physician, Adrian Ashdown, had opined that her impairments were disabling, but summarily discounted this treating source opinion. (Tr. 20). O'Dell appealed this adverse agency decision. On September 15, 2017, this Court remanded O'Dell's case to the Commissioner, finding that the ALJ failed to adequately consider this treating source opinion. Gee v. Berryhill, No. 3:15-CV-2361, 2017 WL 4105202, at *11 (M.D. Pa. Sept. 15, 2017).

A second round of administrative proceedings ensued with an ALJ hearing on March 5, 2019. (Tr. 351-374). Following this hearing, the ALJ entered a second adverse decision on June 10, 2019, denying O'Dell's claims. (Tr. 334-350). Notwithstanding the Court's admonition that the treating source opinion of Dr. Ashdown be carefully assessed, the ALJ once again rejected this treating source opinion. (Tr. 343). This decision also made no mention of a second treating source, Dr. Archana Anil Chaudhari, who opined on September 8, 2016, that O'Dell was disabled due to her anxiety, spinal disorders, and the compounding exacerbating effects of her obesity. (Tr. 666-667).

O'Dell appealed this decision and, on October 22, 2020, this Court remanded the ALJ's decision once again. O'Dell v. Saul, No. 4:19-CV-1583, 2020 WL 6203098, at *7 (M.D. Pa. Oct. 22, 2020). In this decision, the Court cited the treating source opinion of Dr. Chaudhari when it held that the 2019 ALJ decision was fundamentally flawed because it failed, *inter alia*, to consider and address O'Dell's severe emotional impairments. Id. Thus, for a second occasion we found that the ALJ's analysis failed to account for treating source opinions in accordance with the then prevailing treating physician rule.

O'Dell received a third ALJ hearing on July 16, 2021. On August 5, 2021, the ALJ then rejected O'Dell's disability claim for a third time. (Tr. 2145-2165). On this occasion, the ALJ afforded "some weight" to Dr. Ashdown's opinion that O'Dell's

6

obesity impaired her ability to work but otherwise afforded this treating source's medical opinion "little weight." (Tr. 2160-2161). As for Dr. Chaudhari's treating source opinion which cited O'Dell's obesity, anxiety and spinal disorders as wholly disabling impairments, the ALJ gave this opinion "no weight." (Tr. 2161-2162). However, the ALJ's summary, and somewhat sloppy, consideration of this opinion was revealed by the fact that the ALJ did not even properly identify this treating physician, calling the doctor "Adriana Chandler" in this decision. (Id.) This basic error was carried forward in the current ALJ decision, raising ongoing concerns regarding the degree of attention given to this treating source opinion. (Tr. 2103).

O'Dell appealed and on this occasion the Commissioner conceded error in the ALJ's analysis and voluntarily moved to remand this case. On January 27, 2023, the Court granted this motion to remand, setting the stage for the instant agency proceedings. (Tr. 2189-2190). On February 27, 2023, the Social Security Appeals Council then remanded the case to an ALJ with instructions to, *inter alia*, further consider the treating source opinion evidence. (Tr. 2194-2196).

## C. **Treating Source Opinion Evidence**

By the time of this fourth ALJ proceeding, a substantial body of treating source opinion and evidence had been amassed. In fact, no less than three treating sources had opined regarding the severity of O'Dell's physical and emotional

7

impairments. Among these treating physicians there was a complete unanimity of opinion that O'Dell's impairments were totally disabling.

This treating source consensus began with Dr. Adrian Ashdown. On April 1, 2014, Dr. Ashdown, who has a prior extensive treatment history with O'Dell, opined regarding her limitations. (Tr. 303-304). At that time:

> Dr. Ashburn, Plaintiff's treating physician, opined that Plaintiff: (1) would be off task more than fifteen percent (15%) but less than twenty percent (20%) of the work day; (2) had symptoms that would produce good and bad days; (3) would lead to missed time from work one (1) day or less; (4) experienced dizziness as a side effect of a medication; (5) was able to sit for fifteen (15) to twenty (20) minutes at a time before needing to stretch; (6) should change positions every thirty (30) minutes; (7) could stand and/ or walk for up to two (2) hours in an eight (8) hour workday and for fifteen for fifteen (15) minutes at a time; (8) could safely lift up to five (5) pounds for three (3) to eight (8) hours and up to ten (10) pounds for up to three (3) hours in an eight (8) hour work day; and (9) should never lift over ten (10) pounds.

Gee v. Berryhill, No. 3:15-CV-2361, 2017 WL 4105202, at *11 (M.D. Pa. Sept. 15, 2017).

Dr. Ashdown expanded upon this medical opinion on January 16, 2015. (Tr. 333-334). At that time, the doctor focused specifically upon O'Dell's obesity, noting that she weighed 350 pounds and had a BMI of 58.24. (Id.) According to Dr. Ashdown, O'Dell's obesity, coupled with her other impairments, severely limited her ability to stand, walk, perform other manipulative functions and maintain a work pace. (Id.)

A second medical opinion was authored by Dr. Archana Anil Chaudhari on September 8, 2016. (Tr. 666-667). Dr. Chaudhari was part of a treatment team who cared for O'Dell between March 2016 and May 2018. (Tr. 605-824). During this time frame the doctor documented O'Dell's anxiety, depression, chronic pain and morbid obesity. (Id.) As a result of this lengthy treatment history, in September 2016 Dr. Chaudhari also concluded that O'Dell was disabled due to her anxiety, spinal disorders, and the compounding exacerbating effects of her obesity. (Tr. 666-667).

By the time of this latest ALJ proceeding, a third treating source had also opined that O'Dell was disabled. On October 9, 2023, Dr. Roger Scott, who was treating O'Dell, opined that she suffered from morbid obesity and degenerative disc disease of the cervical, thoracic, and lumber spine. (Tr. 3040-3042). According to this treating source, O'Dell could not lift in excess of five pounds, could only stand and walk for one hour during the workday, suffered from "significantly reduce[d] concentration" due to her pain medications, would miss more than four work days per month due to her impairments, and would be off-task for more than a third of the work day. (Id.) As the doctor explained O'Dell's impairments had: "advanced to the extent that daily work schedule is unattainable." (Tr. 3041).

Thus, in a case governed by the treating source rule, there was a complete treating source consensus spanning nine years that O'Dell was unable to work. There was also unanimity among these treating sources that O'Dell's obesity compounded

9

her impairments, and that she was significantly limited in meeting the mental demands of the workplace due to depression, anxiety and fatigue.

### D. <u>Other Opinion Evidence Regarding O'Dell's Emotional Condition</u>

As we have noted, citing to this treating source evidence, in October of 2020, this Court found that the Commissioner failed to adequately consider and address O'Dell's severe emotional impairments, which included anxiety, depression and PTSD. <u>O'Dell v. Saul</u>, No. 4:19-CV-1583, 2020 WL 6203098, at *7 (M.D. Pa. Oct. 22, 2020). By 2024, two consulting sources had also affirmed that O'Dell experienced some restrictions meeting the mental demands of the workplace.

On May 14, 2021, Dr. Anne Miller performed a consultative examination of O'Dell which concluded that she was moderately impaired in terms of adjusting to workplace changes, carrying out complex instructions, and interacting with the public. According to the doctor, O'Dell also displayed mild impairments interacting with coworkers and supervisors. (Tr. 1351-1352). These findings were echoed by a second consulting examining source, Dr. Robert Carey, in December of 2022. At that time Dr. Carey concluded that O'Dell experienced mild to moderate limitations in all spheres of mental functioning in the workplace. (Tr. 2840-2841).

It was against this backdrop that O'Dell's case came to be heard for a fourth time by an ALJ.

E. **The Fourth ALJ Hearing and Decision**

On March 12, 2024, O'Dell received her fourth administrative hearing on her disability claim. (Tr. 2119-2144). Given the sweeping treating source consensus which found that O'Dell was disabled, Dr. Donald Carr, an orthopedist, was called as an expert witness to opine based upon a records review regarding the extent of O'Dell's impairments. (Id.) Based solely upon this document review, Dr. Carr initially stated that O'Dell could perform a range of light work with some postural limitations. (Tr. 2124-2125).

However, it immediately became apparent at the hearing that Dr. Carr had neglected to fully consider one of O'Dell's primary impairments, her morbid obesity, when arriving at this opinion. In fact, Dr. Carr conceded that he had not factored this significant medical condition into his analysis. Indeed, at this hearing Dr. Carr twice admitted that he had not considered O'Dell's obesity when assessing her functional abilities.

At the outset, when the ALJ first asked Dr. Carr if he had considered the role that O'Dell's obesity played in this disability analysis, he denied considering this condition at all, stating: "Oh, typically we're instructed not to consider body habitus in—in—I'm considering these limitations based on the orthopedic evidence I find in the chart." (Tr. 2125). Presented with this admission, the ALJ inquired a second time regarding whether the doctor considered O'Dell's weight when rendering his

11

opinion and Dr. Carr reiterated that he had not evaluated this material factor, stating: "I didn't take into consideration her obesity when—when going through the file as well as the workday limitations." (Tr. 2126). Only after the ALJ persisted in asking the doctor a third time to evaluate O'Dell's obesity did Dr. Carr—apparently for the first time—assess this factor and concede that it would erode her postural abilities, stating that O'Dell's treatment notes "actually state body habitus is contributing significantly to the patient's issues." (Tr. 2127). Whatever limited value this opinion evidence possessed in light of the doctor's admission that he never fully considered O'Dell's obesity prior to the hearing was then further undermined when Dr. Carr apparently acknowledged that the treating physicians were in a better position to evaluate her limitations. As Dr. Carr observed: "Somebody that has seen this patient and taking care of this patient is going to have—and examine this patient is going to have a better perception of their overall ability to function than I am." (Tr. 2138).

Following this hearing, on March 28, 2024, the ALJ issued a fourth decision addressing O'Dell's claim. (Tr. 2086-2106). In this decision, at Step 1 the ALJ found that the plaintiff met the insured status requirements of the Social Security Act through September 30, 2015, and had not engaged in substantial gainful activity since July 4, 2012, the alleged onset date. (Tr. 2092). At Step 2 the ALJ found that O'Dell suffered from the following severe impairments—degenerative disc disease of the cervical, thoracic and lumbar spine and obesity. (Id.)

12

Notably, this Step 2 severity analysis did not include any of O'Dell's well-documented emotional impairments. Instead, the ALJ found at Step 2 that O'Dell did not suffer from any severe emotional impairments. This was a curious conclusion since this Court had already previously remanded O'Dell's case due to the failure to address these mental health impairments. O'Dell v. Saul, No. 4:19-CV-1583, 2020 WL 6203098, at *7 (M.D. Pa. Oct. 22, 2020). Further, this Step 2 determination failed to fully address the treating source consensus that O'Dell suffered from depression and anxiety and would be off-task for significant periods of time during the work day. Finally, this Step 2 assessment seemingly minimized the consulting source opinions which found that the plaintiff faced mild and moderate impairments meeting many of the mental demands of work.

After concluding at Step 3 that none of O'Dell's impairments met a listing requirement, (Tr, 2096), the ALJ fashioned the following residual functional capacity (RFC) assessment for O'Dell:

> After careful consideration of the entire record, the undersigned finds that since July 4, 2012, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant would need the opportunity to stand every five minutes after every fifty minutes of sitting and would remain on task while transferring. The claimant would have frequent pushing and pulling with the bilateral upper and lower extremities. The claimant would be limited to occasional overhead reaching with the right upper extremity and frequent overhead reaching with the left upper extremity. The claimant could have occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching but never crawling or climbing ladders, ropes or scaffolds. The claimant would have no

13

exposure to unprotected heights and moving mechanical parts. The claimant would have occasional exposure to humidity, wetness and vibration and frequent exposure to extreme heat.

(Tr. 2097).

This RFC, which contained no mental restrictions, further highlighted the shortcomings in the ALJ's Step 2 analysis. Additionally, in reaching this conclusion the ALJ once again rejected the longstanding treating source consensus that O'Dell was disabled. (Tr. 2102-2103). However, with respect to both Dr. Ashdown and Dr. Scott, the ALJ's analysis rested, in part, upon a paradoxical proposition—the ALJ discounted these opinions in part because of the doctors' longstanding treating relationships with the plaintiff. For example, the ALJ stated that Dr. Ashdown's opinion deserved little weight because:

> [T]he undersigned has considered the treatment relationship with this provider and the claimant, as he is familiar with the claimant over an extended period, as well as with her response to treatment. However, the doctor is also in a position to accept the claimant's subjective reports for purposes of treatment, as opposed to providing an objective assessment between the subjective reports and objective evidence, as discussed above. As such, the doctor's opinion is given little weight.

(Tr. 2102). Likewise, the ALJ reasoned that Dr. Scott's treating relationship with O'Dell undermined the validity of his medical opinion since: "Dr. Scott is in a position to accept the claimant's subjective reports for purposes of treatment, as opposed to providing an objective assessment between the subjective reports and objective evidence." (Tr. 2103). Thus, the ALJ's decision seemingly turned the

14

virtue of this close treating relationship, one of the keystones of the treating physician rule, into some sort of vice which warranted giving the opinions little weight.

As for the third treating source who opined that O'Dell was disabled, Dr. Chaudhari, the ALJ's decision simply parroted the earlier, flawed analysis of the vacated 2021 ALJ decision. (Tr. 2103). Indeed, this cursory analysis was so superficial that—like the 2021 decision—it also misidentified this treating doctor calling him "Adriana Chandler." (Id.)

Having discounted the unanimous opinions of three treating physicians who independently evaluated O'Dell over the span of ten years, the ALJ then relied upon the 2024 non-treating, non-examining opinion of Dr. Carr to find that O'Dell could perform a limited range of sedentary work. According to the ALJ:

> The opinion of Dr. Carr was given significant weight because it is well supported by his review of the objective medical evidence, including diagnostic testing and clinical findings. In addition, Dr. Carr testified the above limitations also include consideration of the level of obesity in the record and the effects of weight on mobility, as well as effecting the other orthopedic impairments of record.

(Tr. 2100).

This conclusion was curious on several scores. First, while the ALJ purported to give Dr. Carr's opinion significant weight, the limited sedentary RFC actually fashioned by the ALJ was materially different than Dr. Carr's opinion that O'Dell could perform light work. In addition, the ALJ's suggestion that Dr. Carr's opinion

included a careful consideration of the level of obesity in the record and the effects of weight on mobility was simply incorrect. Fairly read, Dr. Carr's testimony was that he *did not* consider O'Dell's obesity in his analysis prior to the hearing and only considered her obesity when urged to do so in the course of the hearing.

Having reached these conclusions, the ALJ held that O'Dell could not perform her past relevant work. (Tr. 2104). The ALJ also found that when O'Dell reached the age of fifty in August of 2018 she met the standard for disability due to the combined effects of her age and impairments. (Tr. 2105-2106). However, according to the ALJ, prior to August 2018 there were jobs which O'Dell could perform. Therefore, the ALJ denied her claim for benefits from 2012 through 2018. (Tr. 2104-2106).

This appeal followed. (Doc. 1). On appeal, the plaintiff argues the ALJ's decision was not supported by substantial evidence because the ALJ erred in evaluating the medical opinion evidence and in formulating O'Dell's RFC. Upon consideration, we agree that this decision—like the three prior decisions made in O'Dell's case—is fundamentally flawed. Therefore, we will order this case remanded for further consideration by the Commissioner.

**III.**   <u>**Discussion**</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [he] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512

18

F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use

19

particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B. **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or he was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

20

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113,

129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

22

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C. Analysis of Medical Opinions—The Treating Source Rule

The Commissioner's regulations which applied in 2012 when O'Dell began this case also set standards for the evaluation of medical evidence, and defined medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence under this treating physician rule, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the

closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasized consideration of the nature of the treating relationship, also called for careful consideration of treating source opinions.

24

Indeed, this Court often addressed the weight which should be afforded to a treating source opinion in Social Security disability appeals governed by these regulations and emphasized the importance of such opinions for informed decision-making in this field. The controlling legal benchmarks in this area which applied to claims lodged prior to March 2017 can be aptly summarized in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)(citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317 .

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

25

Thus, an ALJ may not unilaterally reject a treating source's opinion and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the

wrong reason.'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999) (<u>quoting</u> <u>Mason</u>, 994 F.2d at 1066)); <u>see also</u> <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000). Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D. **The Current ALJ Decision Must Be Vacated.**

In our view, this fourth ALJ decision, like the three decisions which preceded it, is flawed in ways which compel further action. While the plaintiff has launched a multi-facetted challenge to this decision, two errors—each of which implicates the controlling treating physician rule—highlight why the present decision cannot stand.

At the outset, in this latest decision, the ALJ erroneously discounted all of O'Dell's emotional and intellectual limitations at Step 2 of this analysis. Having dismissed these impairments as non-severe at Step 2 the ALJ's RFC then made no provision for her mental and emotional limitations.

The ALJ's Step 2 choice to treat these impairments as non-severe and then neglect to include any emotional limitations in the RFC was at odds with this Court's prior decision which called for more thorough analysis of this issue. <u>O'Dell v. Saul</u>, No. 4:19-CV-1583, 2020 WL 6203098, at *7 (M.D. Pa. Oct. 22, 2020). Moreover, this decision to reject O'Dell's emotional impairments as non-severe at Step 2 was

inconsistent with the settled legal standards governing Step 2 evaluations which provide that:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *'de minimus* screening device to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec.,370 F.3d 357, 360 (3d Cir.2004); Newell v. Comm. of Soc. Sec*.,* 347 F.3d 541, 546 (3d Cir.2003). 'Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.' Id*." Velazquez v. Astrue,* No. 07–5343, 2008 WL 4589831, *3 (E.D.Pa., Oct.15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' McCrea v. Comm'r of Soc. Sec*.,* 370 F.3d 357, 360 (3d Cir.2004). This step should be 'rarely utilized' to deny benefits. Id. at 361. Rather, ... [a]n individual should be denied benefits at step two only if the impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' Id*." Kinney v. Comm'r of Soc. Sec*.,* 244 F. App'x 467, 469–70 (3d Cir.2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." McCrea v. Commissioner of Social Sec*.,* 370 F.3d 357, 360 (3d Cir.2004).

Dotzel v. Astrue, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014). Accordingly, "because step two is to be rarely utilized as basis for the denial of benefits, [] its invocation is certain to raise a judicial eyebrow." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 361 (3d Cir. 2004) (citing SSR 85–28, 1995 WL 56856, at *4 ("Great care should be exercised in applying the not severe impairment concept")).

28

Recognizing that O'Dell's burden at Step 2 is not an exacting one, we find that the ALJ erred in failing to identify her emotional impairments as severe conditions at Step 2, and the failure to consider these conditions past Step 2 then resulted in a flawed RFC which potentially prejudiced the plaintiff's claim. This was error because substantial evidence described the intellectual and emotional barriers confronting O'Dell in the workplace. For example, the treating source evidence—which identified O'Dell as suffering from depression and anxiety and stated that she would be off task between 15% and 33% of the day—plainly described severe mental impairments. Further, the consulting examining experts agreed that the plaintiff faced an array of mild-to-moderate impairments in multiple spheres of work functioning. This evidence certainly met the *de minimis* severity threshold prescribed by law at Step 2, and the ALJ erred in failing to further consider these impairments.

The ALJ then compounded this error by rejecting the unanimous views of three separate treating sources, all of whom found O'Dell disabled, in favor of a single non-treating, non-examining opinion offered by Dr. Carr. This aspect of the ALJ's analysis is flawed in several ways. First, it gave insufficient deference to this sweeping treating source consensus that O'Dell was disabled, which under the treating physician rule was entitled to great weight and careful consideration. The ALJ's evaluation of these treating source opinions also failed to acknowledge how

the three opinions offered over the span of ten years gained persuasive power through their consistency with one another. Moreover, the fact that the ALJ failed to even properly identify one treating source, Dr. Chaudhari, cast doubt over the care and attention given this treating source's judgment that the plaintiff was disabled.

Further, given the then existing regulations' clear deference towards treating source opinions, the ALJ erred in giving greater weight to the 2024 non-treating, non-examining source opinion of Dr. Carr than was afforded to the unanimous opinions of three treating sources. Dr. Carr first opined regarding O'Dell's limitations more than ten years after the alleged onset of her disability. Dr. Carr never examined or treated O'Dell. Moreover, given the central role that O'Dell's morbid obesity played in the disability opinions offered by all of her treating physicians, Dr. Carr's opinion cannot reasonably be given greater weight than these treating sources since Dr. Carr testified in 2024 that: "I didn't take into consideration her obesity when—when going through the file as well as the workday limitations." (Tr. 2126). The ALJ's reliance upon this testimony to overcome both the treating source consensus that O'Dell is disabled and the treating physician rule was particularly problematic given Dr. Carr's concession that: "Somebody that has seen this patient and taking care of this patient is going to have—and examine this patient is going to have a better perception of their overall ability to function than I am." (Tr. 2138). Simply put, Dr. Carr conceded that he failed to consider one of O'Dell

30

chief impairments, her obesity, and admitted that the treating sources, who agreed that O'Dell was disabled, were in a better position to make this judgment. Finally, the ALJ's claim that Dr. Carr's opinion included a careful consideration of the level of obesity in the record and the effects of weight on mobility is incorrect since Dr. Carr actually testified that he *did not* consider O'Dell's obesity in his analysis until urged to do so in the course of the hearing.

Plainly, more is needed here. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). This means that there must be a logical nexus between the ALJ's factual findings and legal conclusion. That logical bridge is missing here. Since the ALJ's burden of articulation is not met in the instant case, this fourth ALJ decision must be vacated.

### E. **This Case Will Be Remanded**

Citing the twelve years of delay in this case and the four flawed ALJ decisions, O'Dell urges us to reverse this decision and order an award of benefits for the period from 2012 to 2018. There is great force to the argument since this case has been marked by significant delays and frequent missteps in the evaluation of the evidence. Moreover, we recognize that the plain language of § 405(g) indicates we are not limited to ordering a remand for further proceedings. Instead "[w]hen reversing the SSA's decision under 42 U.S.C. § 405(g), this Court 'may choose to remand to the

31

Secretary for a further hearing or simply...award benefits.'" Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357–58 (3d Cir. 2008) (citing Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir.1984)). Further, "this judgment concerning the proper form of relief in a Social Security appeal rests in the court's sound discretion." Diaz v. Berryhill, 388 F. Supp. 3d 382, 390–91 (M.D. Pa. 2019).

Yet, while we have the discretion to award benefits, given the tortured history of this case, we acknowledge that the latest decision by the ALJ afforded O'Dell some significant benefits, finding that she was limited to sedentary work and concluding that she was entitled to benefits after August 2018. Thus, the latest decision by the Commissioner reflects a more realistic assessment of the extent and severity of her impairments. In light of this more realistic approach, the Commissioner should be given the first opportunity to correct the remaining flaws in the evaluation of this disability claim. We also recognize that the assessment of medical opinions remains the responsibility of the ALJ. Finally, we are mindful that as a general rule "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Handwerk v. Kijakazi, 692 F. Supp. 3d 458, 471 (M.D. Pa. 2023). Taking all of these factors into consideration, notwithstanding the fact that the ALJ's latest decision must be vacated due to errors in medical opinion evaluation, in the exercise of our discretion, this matter will be remanded for further consideration by the Commissioner. Yet, while we reach this

result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

### III.   Conclusion

Accordingly, given that we find the ALJ's determination is not supported by substantial evidence, the final decision of the Commissioner will be VACATED, and this case will be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: May 14, 2026

33